561 F.Supp.2d 1282 (2008)
SCHOOL BOARD OF LEE COUNTY, Florida, Plaintiff,
v.
E.S., individually, and on behalf of B.S., a minor, Defendants. and
E.S., individually, and on behalf of B.S., a minor, Third Party Plaintiffs,
v.
Terry Andrews, individually, and Elaine Ford, individually, Third Party Defendants.
No. 2:06-cv-198-FtM-29DNF.
United States District Court, M.D. Florida, Ft. Myers Division.
March 10, 2008.
*1284 Edward S. Polk, Cole, Scott & Kissane, PA, Miami, FL, for School Board of Lee County, Terry Andrews and Elaine Ford.
Paul E. Liles, Alvarez, Sambol, Winthrop & Madson, PA, Fort Myers, FL, for E.S. Individually, and On Behalf of B.S., An Minor.

OPINION AND ORDER
JOHN E. STEELE, District Judge.
This matter comes before the Court on a Report and Recommendation (Doc. # 54) filed on August 27, 2007, addressing claims brought under the Individuals with Disabilities Education Act (IDEA). Both sides have filed Objections (Docs. ## 55, 56) to the Report and Recommendation. The School Board also filed a Response (Doc. # 57) and a Request for Oral Argument (Doc. # 58). The Court reviews the Report and Recommendation de novo.

I.
As the Report and Recommendation states (Doc. # 54, p. 5), this Court has previously ordered the Lee County School Board (the School Board) to place B.S., an autistic and language impaired child born on July 3, 1990, in a residential program which would allow him to obtain educational benefit. This order was affirmed on appeal in an unpublished decision. E.S. v. School Bd. of Lee County, Fla., 87 Fed. Appx. 711 (11th Cir.2003) (Table).[1]
B.S. was placed in a residential program known as Heartspring in Wichita, Kansas, beginning April 14, 2003. B.S.'s educational progress and situation at Heartspring is summarized in the Report and Recommendation, Doc. # 54, pp. 6-9. In 2004, the School Board determined that B.S. could be placed in a non-residential program at Diplomat Middle School (Diplomat or DMS) in Lee County, Florida, instead of Heartspring, and a May/June 2004 Individualized Education Program (IEP) proposed transferring B.S. to Diplomat. A summary of the program at Diplomat is set forth in the Report and Recommendation, Doc. # 54, pp. 9-14. On November 24, 2004, the parent (E.S.) and B.S. filed a demand for a due process hearing from the proposed May/June 2004 IEP and invoked the "stay put" provisions of the IDEA allowing B.S. to remain at Heartspring.
The primary substantive issue at the due process hearing, in addition to various procedural issues, was whether B.S. would receive educational benefit in the non-residential program at Diplomat. In due course, an Administrative Law Judge (ALJ) issued a Final Order finding that: (1) B.S. "cannot enjoy the educational benefit of a non-residential placement, including the inherent benefits of association with mainstream students, until his maladaptive behavior is eliminated." (Doc. # 1-2, ¶ 66); (2) B.S.'s "maladaptive behaviors have not been eliminated. Although the frequency of [self-injurious behavior] SIB has decreased at Heartspring, the frequency of other maladaptive behaviors has increased, and new maladaptive behaviors have emerged." (Doc. # 1-2, ¶ 67); (3) "Increased or new maladaptive behaviors include elopement, dropping, aggression, property destruction, stripping, masturbation, and tantrums. [B.S.] is preoccupied with water and will create water with his own urine when desired." (Doc. # 1-2, ¶ 68); and (4) "Only in a residential placement can [B.S.] receive the 24-hour *1285 consistency that is necessary for a basic floor of opportunity to make educational process [sic] in his primary educational needs for behavior modification and communication." (Doc. # 1-2, ¶ 69.) The ALJ found no changed circumstances which would allow non-residential placement, and found placement at Diplomat pursuant to the May/June 2005 IEP was inappropriate and that continued placement in Heartspring was appropriate. (Doc. # 1-2, ¶¶ 71-98.) The ALJ concluded that E.S. "showed by a preponderance of the evidence that the challenged IEP is not reasonably calculated to provide FAPE [a Free and Appropriate Public Education] to [B.S.] and does not provide a basic floor of opportunity for [B.S.] to make educational progress towards goals and objectives that are appropriate for his unique educational needs." (Doc. # 1-2, ¶ 117.) The ALJ also found the proposed procedure for transition from Heartspring to Diplomat was inadequate and that there was no adequate behavior intervention plan. (Doc. # 1-2, ¶¶ 99-102.)
The ALJ further found that the proposed May/June 2004 IEP was developed in violation of procedural due process rights, in that the School Board: (1) Failed to provide appropriate responses to requests by E.S. for prior written notice of the IEP meeting and the proposed change in placement; (2) failed to provide or timely provide the parents with copies of the report prepared by the behavior analyst and reports of other School Board employees; (3) failed to initiate a requested Independent Educational Evaluation (IEE) or advise E.S. how to obtain an IEE; (4) failed to provide adequate notice of the May 25, 2004, IEP meeting so as to enable the parents' in person attendance; and (5) predetermined the transfer to Diplomat with an egregious paucity of evidence of changed circumstances before convening the IEP meeting. (Doc. # 1-2, ¶¶ 103-10.)
The ALJ ordered and adjudged that "[t]he challenged IEP is not reasonably calculated to provide [B.S.] with FAPE and does not adequately address [B.S.'s] unique educational needs. Placement of [B.S.] in DMS pursuant to the challenged IEP is inappropriate, and continued placement in Heartspring is appropriate." (Doc. # 1-2, p. 33.)
The School Board filed the instant Complaint (Doc. # 1) challenging the ALJ's Final Order (Doc. # 1-2). E.S. filed a Counterclaim against the School Board for attorney fees, failure to provide B.S. a FAPE, and other claims not relevant to the IDEA claims.

II.
The Report and Recommendation noted that, as in the earlier case, "the proper placement of [B.S.] is a very difficult decision." (Doc. # 54, p. 17.) The magistrate judge concluded that while the program at Diplomat appeared to be a wonderful program for a child with autism, its value would be lost as to B.S. because it would not be reinforced with consistency throughout the Child's entire day once he leaves school. The magistrate judge concluded that the consistency of a residential placement facility was needed for B.S. to obtain educational benefit, and therefore recommended that B.S. remain in a residential facility (although not necessarily Heartspring). The magistrate judge also recommended that the claims of various procedural inadequacies be rejected, and that the ALJ's findings to the contrary as to the procedural aspects be rejected.

III.
Both sides object to portions of the magistrate judge's Report and Recommendation. The School Board primarily objects to the finding that the ALJ was correct as to residential placement. The parent and *1286 B.S. object to the magistrate judge's rejection of their claimed procedural deficiencies. The Court reviews the objections de novo.

A. The School Board's Objections
(1) Burden of Proof: The School Board asserts that while the Report and Recommendation properly stated that the burden of proof was with E.S., the actual analysis of the issue of placement was fatally inconsistent and effectively placed the burden on the School Board (Doc. # 56, pp. 5-10). The Court disagrees, and finds that the magistrate judge did not erroneously shift the burden of proof to the School Board. As the School Board concedes, the magistrate judge correctly stated that, as the party seeking relief, the burden was on E.S. in connection with the placement issue. (Doc. # 54, p. 3.) While the Court doubts that the magistrate judge forgot this burden, there is certain language concerning what the School Board failed to prove which may be ambiguous in this regard (Doc. # 54, p. 27), and this language is not adopted. The Court finds from its review of the record that E.S. has met her burden of showing by a preponderance of the evidence that placement must continue to be in a residential facility, although not necessarily the one at Heartspring. This objection is otherwise overruled.
(2) Denial of Access/Notice: The School Board also objects to the magistrate judge's finding that the parent was denied access to some educational records prior to the IEP meeting, including some evaluations of B.S. (Doc. # 54, p. 23), and that the School Board failed to provide notice of the IEP meeting and copies of records (Doc. #54, p. 23). The School Board wants these facts corrected even though the Report and Recommendation found no basis for relief despite these deficiencies, and thus found in its favor on the issue. (Doc. # 56, pp. 10-13.) The Court concludes that the magistrate judge's factual findings are correct, and therefore this objection is overruled.
(3) Criticism: The School Board objects to the magistrate judge's comment in connection with the IEE issue that certain School Board conduct is not "condoned," even though the magistrate judge ruled in favor of the School Board by finding no procedural flaw by the School Board on the issue. (Doc. # 56, pp. 13-14.) The Court finds no basis to sustain an objection simply because the School Board disagrees with a portion of the magistrate judge's analysis in deciding an issue in its favor. This objection is overruled.
(4) No Cost to Parent: The School Board states that if residential placement is ordered, it should be ordered to be provided at no cost to the Parent, rather than at the School Board's expense. The School Board states that it believes the Florida Agency for Persons With Disabilities (APD) should participate in the expense of any residential placement mandated in this case. (Doc. # 56, pp. 14-15.)
The Court expresses no view on this argument concerning the APD, but will require the School Board to ensure that the placement is at no cost to the Parent, as provided for in 20 U.S.C. § 1412(a)(10) (B)(i). In other words, if there is to be a fight over payment, it is to be between the School Board and the APD, not the parent and APD.
(5) Factual Objections: The School Board also makes seven objections to factual findings (Doc. # 56, pp. 2-4), which the Court resolves as follows:
(a) The Court agrees that the federal proceeding is a de novo review of the ALJ's Final Order pursuant to the IDEA. The Report and Recommendation recognized this as well (Doc. # 54, p. 2.) Since *1287 nothing more is required, this objection is overruled.
(b) The Court agrees that "elopement" must be considered within the context of its definition as utilized by Heartspring. The Court finds that there is no factual inaccuracy in the statements in the Report and Recommendation that B.S.'s elopement had increased at Heartspring (Doc. # 54, p. 7) and that B.S. made educational progress at Heartspring (Doc. # 54, pp. 6-7.) The objection is overruled.
(c) While the Court agrees that B.S.'s other behavioral issues must be considered in connection with the definitions of those terms, the record does not support the School Board's statements that "there is no evidence of violent behavior or conduct which creates a serious safety threat" and that "there is no evidence that those behaviors [masturbation and stripping] are depriving the Child of meaningful educational benefit." (Doc. # 56, p. 3.) Both the ALJ and the magistrate judge found such evidence, and after review the Court agrees with those findings. This objection is overruled.
(d) The Court will assume that the School Board is correct that with the Medicaid Waiver the various services available to B.S. and his parentssuch as respite care, personal care assistance, behavioral analysis, residential placement, and other services"are mandatory and not dependent on the availability of funding." (Doc. # 56, p. 3.) This does not change any aspect of the Report and Recommendation, and therefore the objection is overruled.
(e) The Court will accept the School Board's observation (Doc. # 56, pp. 3-4) that while no one from Heartspring proposed B.S. be moved to Lee County, as stated in the Report and Recommendation (Doe. # 54, p. 14), the Heartspring staff ultimately took a neutral position as to the placement of B.S. and had no first-hand knowledge of the Lee County facilities. This does not change the findings in the Report and Recommendation or the Court's view that these findings as to placement are correct. The objection is overruled.
(f) The School Board objects to the Report and Recommendation finding that "The Parent never received access to the Child's educational records prior to the IEP meeting." (Doc. # 54, p. 23.) Finding the statement to be supported by the record, the Court overrules the objection.
(g) The Report and Recommendation stated that E.S. testified she received notice of the May, 2004 IEP meeting from Heartspring, and the notification was too close to the meeting for her to attend in person as she wished, and she could only attend by telephone. (Doc. # 54, p. 23.) The School Board asserts that E.S. admitted on cross examination that she does not remember whether she got a written notice of the May 25, 2004 IEP meeting, and did not deny receiving it. The Court will accept this testimony, but it does not change the accuracy of the factual determinations in the Report and Recommendation. The Court adopts those factual findings and overrules the objection.

B. E.S. and B.S.'s Objections
E.S. also objects to portions of the Report and Recommendation, focusing upon the procedural defects found by the ALJ but rejected by the magistrate judge.
(1) Standard of Review: E.S. asserts that the magistrate judge improperly substituted his judgment for that of the ALJ. E.S. also asserts that a court may not enter an order inconsistent with the ALJ's credibility determinations without personally hearing the live testimony of the witnesses whose testimony is determinative. The: Court overrules these objections.
The Report and Recommendation set forth the proper standard to be used in *1288 evaluating the factual findings by an ALJ. (Doc. # 54 pp. 3-4, citing Board of Educ. v. Rowley, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) and M.M. v. School Bd. of Miami-Dade, 437 F.3d 1085, 1097 (11th Cir.2006)). "[T]he district court judge conducts an entirely de novo review of the ALJ's findings, [ ] and has discretion to determine the level of deference it will give to the ALJ's findings." School Bd. of Collier County v. K.C., 285 F.3d 977, 982-83 (11th Cir.2002) (emphasis in original) (internal citations omitted). Nothing prevents a district judge from factfinding in IDEA cases. M.T.V. v. Dekalb County Sch. Dist., 446 F.3d 1153, 1155 (11th Cir. 2006). Thus, there is no rule in the IDEA context that an ALJ's credibility findings must be accepted unless the reviewing judge personally rehears live testimony of the witness. E.S.'s reliance on such a rule in the context of an evidentiary hearing before a magistrate judge which is reviewed by a district judge is not controlling since that rule is premised on the interpretation of a different federal statute. E.g., Amlong & Amlong, P.A. v. Denny's Inc., 500 F.3d 1230, 1244-46 (11th Cir.2006).
(2) Meaningful Input into IEP Meeting: E.S. asserts that she was not allowed to have meaningful input into the May/June 2004 IEP meeting, and the magistrate judge erred in finding to the contrary. The magistrate judge correctly stated that
[a]n IEP will not be automatically rendered legally defective if it contains procedural flaws. [ ] An IEP will be set aside for procedural violation only if there is a rational basis to believe that the procedural inadequacies have compromised the student's right to an appropriate education, or have seriously hampered the parents' opportunity to participate in the formulation of the IEP or caused a deprivation of educational benefits. [ ] The parents bear the burden of proving that the procedural flaw harmed the child.
(Doc. # 54, p. 20) (internal citations omitted). After summarizing the claims of lack of timely notice of the May 25, 2004 IEP meeting and the failure to provide all of B.S.'s requested educational records, the magistrate judge stated that "[t]he Parent must show that she was hampered in her ability to participate in the formation of the IEP." (Doc. # 54, p. 22.) The magistrate judge then accepted testimony establishing that E.S. received notice of the May 25, 2004 IEP meeting only when someone from Heartspring called her very close in time to the meeting; that while she wanted to be physically present at the meeting, she was unable to do so because of the lack of sufficient notice; that she appeared at the May meeting by telephone; that there were telephone problems during the meeting, and communication was lost for 20-30 minutes; that she did not receive any reports prior to the May meeting; that she did attend the June 25, 2004 IEP meeting in person; that she never received access to B.S.'s education records prior to the IEP meeting, and that some of the omitted records were evaluations of B.S. (Doc. # 54, p. 23.) Despite these procedural shortcomings, the magistrate judge found that "it is clear that the Parent participated in both the May and June 2004 IEP meetings. The Parent's concerns were listed in the proposed IEP. [ ] The Parent was concerned about consistency in [B.S.]'s education and she wanted him to continue making progress.[] The Court does not condone the actions of the School Board by not providing notice and copies of the records, however, there was no evidence that the Parent or S.S. [B.S.'s father] was hampered in their ability to participate fully in the IEP meeting." (Doc. # 54, p. 23.)
*1289 The Eleventh Circuit has rejected an argument that a violation of the notice requirement is a per se violation of IDEA which by itself constitutes a denial of FAPE. Doe v. Alabama State Dep't of Educ., 915 F.2d 651, 660-663 (11th Cir. 1990); Weiss by & Through Weiss v. School Bd. of Hillsborough County, 141 F.3d 990, 994 (11th Cir.1998). The Court held that no relief was required where the parents fully participated in the IEP process and there was no harm flowing from the procedural violation. Doe, 915 F.2d at 663. The Court's review of the record establishes that E.S. fully participated in the IEP process and there was no harm flowing from the procedural violations. This is not to say that E.S. prevailed as to her wishes in connection with the IEP; she obviously did not. But she was a full participant in the process despite the procedural violations, and the deficiencies (from her perspective) of the resulting IEP did not flow from the procedural violations. This objection is overruled.
(3) Pre-Determination of B.S.'s Placement: E.S. asserts that the School Board pre-determined that B.S. would be placed at Diplomat prior to the IEP meeting and pre-determined a portion of the content of the IEP, an issue not addressed in the Report and Recommendation. The record does not support such a claim, and the objection is overruled.
(4) Failure to Provide Independent Educational Evaluation (IEE): E.S. asserts that on October 8, 2004, her attorney requested an IEE. Faced with such a request, E.S. asserts that the School Board had to (a) provide its criteria for an IEE and information about where E.S. could obtain an IEE; and (b) either (i) ensure that the IEE was provided at no cost to E.S., or (ii) initiate a due process hearing to show either that the School Board's evaluation was appropriate or the E.S.'s IEE did not meet the School Board's criteria. E.S. asserts that the School Board did not provide information to E.S. until February 2005, declined to pay for the IEEs that E.S. proposed, failed to provide written notice, and did not request a due process hearing, all violations of her rights.
As the Report and Recommendation correctly summarized (Doc. # 54, pp. 24-25), E.S.'s October 8, 2004 letter simply requested "independent evaluations," without specifying what evaluations were being sought. The School Board responded by letter, asking counsel to specify the evaluations being requested. It was not until the November 24, 2004 due process hearing demand letter from E.S.'s counsel that he identified seven specific evaluations and a catchall evaluation which were being requested. When the School Board did attempt to arrange an IEE, the parties could not agree on the evaluator.
The Court agrees with the magistrate judge that E.S.'s initial request for "independent evaluations" was too vague to trigger any obligation concerning an IEE by the School Board. As the numerous evaluations requested on November 24 exemplified, the School Board's request for clarification was both reasonable and necessary, and was not a procedural violation. The Court rejects E.S.'s waiver argument (Doc. # 55, p. 11) as having no support from any binding precedent. The Court also rejects the ALJ's view that a mere request for an IEE triggers the right to have the School Board comply with the request or seek a due process hearing. Rather, if the School Board does not comply with the request, the burden is upon E.S. to present a complaint pursuant to 20 U.S.C. S 1415(b) (6), and to request a due process hearing pursuant to 20 U.S.C. § 1415(f)(1). The Court, overrules this objection.
(5) Failure to Provide PWN: E.S. argues that a prior written notice (PWN) was required when the School Board proposed *1290 to change B.S.'s placement, and that the School Board failed to provide appropriate responses to requests for PWNs concerning E.S.'s request for an IEP meeting, request for an IEE, and the proposed change in educational placement. E.S. objects to the magistrate judge's contrary finding. For the reasons set forth in the Report and Recommendation (Doc. # 54, pp. 22-23) the Court overrules this objection.
(6) Procedural Flaws in the IEP: E.S. asserts that the IEP was procedurally flawed in a number of ways. The Court finds that the record supports the findings and conclusions of the magistrate judge as to these issues. (Doc. # 54, pp. 23-27.) The objections are overruled.
Accordingly, it is now
ORDERED:
1. The Report and Recommendation (Doc. # 54) is ACCEPTED AND ADOPTED, with the exception of the language on page 27 noted above, as supplemented by the Opinion and Order.
2. As to the Complaint (Doc. # 1), the Court finds in favor of E.S. individually and on behalf of B.S. as to the requirement of residential placement of B.S. at no cost to E.S., and finds in favor of the School Board as to the alleged denial of FAPE based on procedural deficiencies.
3. As to Count I of the Counterclaim, the Court finds in favor of E.S. individually and on behalf of B.S. as the prevailing party on the predominant issue concerning the placement of B.S. A motion for attorney fees and costs may be filed within THIRTY (30) DAYS of this Opinion and Order.
4. As to Count II of the Counterclaim, the Court finds in favor of E.S. individually and on behalf of B.S. as to the placement in a residential facility, and for the School Board as to the alleged procedural deficiencies.
2. The magistrate judge shall enter a scheduling order as to the remaining outstanding claims, including the filing of a response to the School Board's Motion to Dismiss Counterclaim and Third-Party Defendants' Motion to Dismiss Third Party Claims (Doc. # 28).[2]
6. The Request for Oral Argument (Doc. # 58) is DENIED.
DONE AND ORDERED.

REPORT AND RECOMMENDATION
DOUGLAS N. FRAZIER, United States Magistrate Judge.
TO THE UNITED STATES DISTRICT COURT
This action was filed pursuant to the Individuals with Disabilities Act ("IDEA"), 20 U.S.C. 1400 et seq. by the Plaintiff, the School Board of Lee County, Florida ("School Board"). The Defendants, E.S., (the "Parent") individually and behalf of B.S. (the "Child") filed a Counterclaim and Third Party Complaint (Doc. 11) pursuant to the IDEA, the related Florida Statutes, and the civil rights statutes. The School Board asserts that it was adversely affected by certain portions of the Final Order dated March 17, 2006, and seeks de novo review of the Final Order pursuant to 20 U.S.C. § 1415(i)(2)(A). The Parent and Child claim that the Child was denied a free and appropriate public education ("FAPE") which violates the IDEA and Florida Statutes, and that Third-Party Defendants Terry Andrews, Elaine Ford, and the School Board violated the Plaintiffs' procedural due process rights.[1]
*1291 Pursuant to the IDEA and the companion Florida Statutes[2], the School Board must provide the Child with FAPE. M.M. v. School Board of Miami-Dade Comity, 437 F.3d 1085, 1095 (11th Cir.2006). Integral to the concept of an "appropriate" education is that notion that the services provided must be tailored to serve the individual needs of the child and not the child's disability. Id. To insure that each child's individual educational needs are met, the school and parents work together to develop an individualized education program ("IEP"). Id. Under the IDEA, a child is not entitled to the best program available nor must a program maximize a child's potential. Id. at 1102. The educational program must be sufficient to provide the child with some educational benefit. Id. at 1103, (citing JSK v. Hendry County Sch. Bd., 941 F.2d 1563, 1573 (11th Cir.1991)).
If the parents and school cannot agree on the contents of the IEP, either party may request a due process hearing. 20 U.S.C. § 1415(f)[3]. In Florida, due process hearings are conducted by an administrative hearing officer of the Division of Administrative Hearings ("DOAH"). Fla. Stat. § 230.23(4)(m)(5). The burden of proof or persuasion at the administrative hearing lies with the party who is seeking relief. Schaffer v. Weast, 546 U.S. 49, 126 S.Ct. 528, 537, 163 L.Ed.2d 387 (2005), M.M. v. School Board of Miami-Dade County, Florida, 437 F.3d 1085, 1096, n. 8 (11th Cir.2006). In this case, the Parent was seeking relief from the May/June 2004 IEP.
"The Supreme Court has established a two-part test to determine whether a student has been denied a FAPE." Board of Education of Hendrick Hudson Central School District, Westchester County v. Rowley, 458 U.S. 176, 206-207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). An ALJ must first determine whether the School Board has complied with the procedural requirements of the IDEA, and then the ALJ must determine whether the IEP was "reasonably calculated to enable the child to receive educational benefits." Id. at 207, 102 S.Ct. 3034. If the ALJ determines that the School Board has complied with the IDEA's procedural requirements and the IEP does provide the child with necessary services, then the School Board has provided the child with FAPE. Id. The ALJ may also find that the School Board has failed to comply with the IDEA's procedural requirements. Id.
The DOAH decision is a final order which entitles a party adversely affected to bring an action in either a federal district court or a state court of competent jurisdiction. Fla. Stat. § 230.23(4)(m)(4), and 20 U.S.C. § 1415(i)(2). The District Court must give "due weight" to the decision of the ALJ, but the federal action is an independent action and not merely a review of the state administrative decision. See, *1292 Rowley, 458 U.S. at 206, 102 S.Ct. 3034, M.M., 437 F.3d at 1097. The findings of fact by the ALJ are considered to be "prima facie correct" and if the District Court fails to adopt these findings of fact it must explain why. M.M., 437 F.3d at 1097. The District Court must also follow the Supreme Court's two-step analysis, first whether the School Board followed the procedural requirements of the IDEA, and second whether the proposed IEP provided the child with FAPE. Id. (citing Rowley, 458 U.S. at 206-207, 102 S.Ct. 3034). If the District Court determines that the School Board has complied with the procedural requirements of the IDEA and the IEP provided the child with FAPE, then the inquiry ends. Id. If, however, the District Court determines that the School Board did not comply with the procedural requirements of the IDEA or that the IEP does not provide the child with FAPE, then the District Court "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1412(a) (1)(C)(ii). "The reviewing court has broad discretion in determining what is appropriate based on the circumstances of each case." M.M., 437 F.3d at 1097-8, (citing School Committee of Town of Burlington v. Department of Education of Massachusetts, 471 U.S. 359, 365, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)).

I. Procedural History
On March 17, 2006, the Administrative Law Judge Daniel Manry ("ALJ") entered a Final Order[4] and found the following:
The challenged IEP is not reasonably calculated to provide Petitioner [the Child] with FAPE and does not adequately address Petitioner's unique educational needs. Placement of Petitioner in DMS [Diplomat Middle School] pursuant to the challenged IEP is inappropriate, and continued placement in Heartspring is appropriate.
(Final Order, p. 33). The Final Order entered by the ALJ was not appealed.
The School Board filed its Complaint on April 12, 2006. This action is the second action filed in this Court involving these same parties. In 2000, the Child and Parent filed an action, Case No. 2:00-cv-60-FtM-29 DNF asking for review of a Final Order entered by a different Administrative Law Judge. The main issues in the prior case were the development of an appropriate IEP and the placement of the Child. This Court recommended that the Child be placed in a residential program which would allow him to obtain educational benefit. The District Court adopted the Report and Recommendation by Order (Doc. 90 in Case No. 2:00-cv-60-FtM-29DNF) on September 10, 2002, with supplementation and required the School Board to place the child in a residential program. On October 28, 2003, the Eleventh Circuit affirmed the District Court's decision regarding placement in a residential facility.[5] (See, Doc. 141 in Case No. 2:00-cv-60-FtM-29DNF).
The Court received the record of the proceedings before DOAH, along with the Proposed Findings of Fact and Conclusions of Law submitted by both parties and their respective responses. (Docs.33, 36, 38, 43) The parties agreed to allow additional evidence in this case which included the depositions of Terry Andrews and Robin Frink. (See, Docs. 41 and 42).

II. Facts
The School Board of Lee County is an agency that operates, controls, and supervises all of the public schools in the School District of Lee County, Florida *1293 and receives state and federal funding, and therefore it subject to the requirements of the IDEA. (Final Order, p. 3). The Child was born on July 3, 1990, and is enrolled in the School District of Lee County. (Pet.A-3-1[6]). The Child qualified for services under the IDEA based upon his exceptionalities of autism, and language impaired. (Pet.A-3-1). The child was diagnosed with autism, encephalopathy, dyspraxia, mild left scoliosis, and chronic allergic rhinitis. (Pet.A-1-15, A-2-18). Based upon the rulings in the prior federal case, the Child was enrolled at Heartspring on April 14, 2003 and an IEP was completed on July 8, 2003, which was not challenged. (Pet.A-11).
It is undisputed that the Child made educational progress at Heartspring under the 2003 IEP. (Final Order, p. 12). The staff at Heartspring prepared an in depth draft of an Annual IEP on May 25, 2004, indicating the Child's present levels as well as the other requirements of an IEP. (See, Pet. A-2-1 through 26). Based upon this draft IEP, it shows that the Child progressed with his gross motor skills by walking on a treadmill for 14 minutes, learning to roller skate, beginning to swim, and learning to ride an adapted tricycle. (Pet.A-2-3). When he arrived at Heartspring, he preferred to be wrapped in a blanket, and refused to use his hands often sitting on them to avoid participation. (Pet. A-2-5, A2-11, Admin. Tr.[7] p. 480). He was willing to use his hands only for self-injurious behavior and to occasionally take food. (Admin.Tr. p. 480). The Child needed hand-over-hand assistance to begin any activity. (Pet.A-2-5). At Heartspring, the Child learned to reach and grasp for objects and release and pick up objects, although at times he needed prompting. (Pet.A-2-5). When he arrived at Heartspring, the Child refused to eat with utensils, however, now he has accepted eating food with utensils, and is able to scoop food with a spoon and pierce bites of food with a fork with supervision. (Pet.A-2-6). His dressing capabilities have also advanced from requiring a great deal of assistance, to becoming more independent, if the clothing is in the correct orientation. (Pet.A-2-6). The Child continues to be dependent on aids for personal hygiene, but when he arrived at Heartspring he resisted bathing, but now he accepts it with hand-over-hand assistance. (Pet.A-2-6).
The Child is capable of following a few simple commands such as "sit down," however he is inconsistent with verbal commands and better with visual cues. (Pet.A-2-10). When the Child does not respond to a command, he will do nothing, will attempt to leave, will have a tantrum, or will attempt to follow the direction but will do the wrong thing. (Pet.A-2-10). The learning process is slow. (Pet.A-2-11). The Child is nonverbal, but does make sounds and can say "no" but not at the appropriate times. (Pet.A-2-11). The Child will stare at an item, but it is difficult to determine if this is an item the Child wants. (Pet.A-2-11). The Child uses his hands to reach for an object, or for self-injurious behavior, but does not demonstrate that he is capable of understanding sign language. (Pet.A-2-12). The staff al Heartspring found sign language not to be an appropriate system for the Child. (Pet.A-2-12). The Child is able to communicate by using a picture symbol, but not consistently and there are many instances of self-injurious behavior and whining during these sessions. (Pet.A-2-12). The Child makes more accurate *1294 choices when the actual object is placed in front of him. (Pet.A-2-12).
The Child's activity level has increased since arriving at Heartspring. (Pet.A-2-15). When he arrived he was lethargic and not aware of his environment. (Pet.A-2-15). The Child is now active. (Pet.A-2-15). He walks from location to location, however, due to this new activity level, the Child also attempts to elope more frequently. (Pet.A-2-15). His elopement has increased since arriving at Heartspring from 7 times per day to over 20 times per day. (Pet.A-2-25). The staff at Heartspring recommends that the Child use the object/picture scheduling system they developed with the Child which needs to be reinforced at school, during leisure activities, and at home. (Pet.A-2-15). He needs structured activities at school and at home. (Pet.A-2-15).
At Heartspring, the child is in a classroom with 7 other students. (Pet.A-2-18). The classroom has separate work areas for each student, and an individual schedule for each student. (Pet.A-2-18). The classroom has group, snack, break and computer areas. (Pet.A-2-18). The Child uses a picture system for his schedule, and is prompted when necessary to go to the location that matches the picture. (Pet.A-2-18). When he completes the activity, he is given a break chip to go the break area. (Pet.A-2-18). His breaks are structured. (Pet.A-2-18). The child needs a staff member with him at all times during the day to keep him on schedule. (Pet.A-2-18). When the Child is being taught, the instructor is within 12 inches of him or else the Child will leave his seat and walk away or turn away. (Admin.Tr. p. 499-500). In the classroom, the Child had incidents of aggression where he would scream, and then he would pinch or scratch. (Admin.Tr. p. 503). The Child also had problems with dropping (moving from one place to another and then stopping and lowering himself to the floor), elopement (leaving the area), masturbation, stripping, property destruction, and hitting of the ears to the point of tissue damage. (Admin.Tr. p. 504-505, 511-513). Even though there was a significant decrease in the ear hitting behavior, the Child continues to hit his ears. (Admin.Tr. p. 513). His ear hitting was over 6000 times per day when he arrived at Heartspring, and it decreased to over 2000 times per day in April/May 2004. (Pet.A-2-15).
The Child lives in a group home at Heartspring. (Pet.A-2-19). Due to his problems with elopement, he has someone with him at all times. (Pet.A-2-19). His schedule at home is set up the same way as in the classroom. (Pet.A-2-19). The Child needs prompts to complete tasks, and needs supervision to monitor his ear hitting. (Pet.A-2-19). The Child needs adult assistance to complete almost all of his daily routine. (Pet.A-2-20).
At the administrative hearing, Kelly Denney who is an ESE teacher at Diplomat Middle School ("Diplomat") testified as to the classroom at Diplomat that the Child would be transferred to from Heartspring. (Admin.Tr. p. 55). Ms. Denny is certified in K through 12 for ESE. (Admin.Tr. p. 56). In her classroom in October 2004, she had six students and two aids. (Admin.Tr. p. 56). Ms. Denney observed the Child in September 2004 at Heartspring. (Admin.Tr. p. 59). The classroom is ESE autistic. (Admin. Tr.[8] p. 69). Diplomat has 1200 students enrolled at the school and less than 100 are ESE students. (Admin.Tr. p. 70). The classroom *1295 is located in the hallway with eighth grade classes. (Admin.Tr. p. 71).
In the classroom is a large semi-circular table which is used for group work, speech work, and arts and crafts. (Admin.Tr. p. 72). There is also a separate area for coloring and art. (Admin.Tr. p. 72). The Child's schedule is posted on a partition. (Admin.Tr. p. 72). There are student desks in the front of the classroom, and each student has an assigned desk. (Admin.Tr. p. 73). The classroom has round tables in the back used mainly for cooking and eating snacks. (Admin.Tr. p. 73). The classroom also has three computers for the students. (Admin.Tr. p. 73-74). One computer program that the other students like talks to the students and teaches them to type, helps them verbalize, and teaches them to spell. (Admin.Tr. p. 74). During the day, other students and teachers come into the room which is encouraged by Ms. Denney so that her students do have some distractions during the day. (Admin.Tr. p. 75). Ms. Denney uses outside people to help her students communicate and socialize more. (Admin.Tr. p. 76).
The students choose chores that are done weekly. Some of the chores include vacuuming, wiping tables, doing laundry, sweeping, and making Kool-Aid. (Admin.Tr. p. 90). If a student has an affinity towards water, the student may choose wiping tables and using squirt bottles. (Admin.Tr. p. 90).
There is a laundry machine and dryer in the room. (Admin.Tr. p. 76). The students do laundry for the students who have violated the dress code and have to change into proper attire. (Admin.Tr. p. 76). A student from Ms. Denney's classroom accompanied by an adult will take the laundry basket upstairs to the timeout room and gather the laundry. (Admin.Tr. p. 77). The student will socialize with the adult in the timeout room, and then bring the laundry back to the classroom to wash. (Admin.Tr. p. 77). Ms. Denney finds that by allowing students to leave the room for legitimate reasons, it teaches the students that there are rules and helps with the elopement problem. (Admin.Tr. p. 78). The students put the laundry in the washer, sometimes measure the soap, turn on the machine, take the laundry from the washer and put it in the dryer, take it out of the dryer, and fold it with an adult. (Admin.Tr. p. 78-9). The classroom is equipped with a refrigerator, oven, stove, toaster oven, and coffeepot. (Tr. p. 75, 79). The room also has a sink which is used to wash dishes. (Admin.Tr. p. 78). The room is equipped with a bathroom. (Admin.Tr. p. 80). Ms. Denney uses the bathroom to achieve goals regarding hygiene. (Admin.Tr. p. 89). The bathroom is equipped with towels, soap and shampoo, and the students are permitted to shower there. (Admin.Tr. p. 89).
There are red boxes in the room that contain work tasks. (Admin.Tr. p. 80). The student pulls his name from a bucket and puts his name tag on a task. (Admin.Tr. p. 81). The student then takes the task to his desk, completes the task, and puts it back. (Admin.Tr. p. 81). Throughout the week, the students complete all the tasks in the various red boxes. (Admin.Tr. p. 81). Blue boxes are used for leisure time activities. (Admin.Tr. p. 81). Other leisure activities include musical instruments and theraputty (similar to Play-Doh). (Admin.Tr. p. 85). One table has different types of media, such as dried kidney beans, water or sand, and the students are permitted to play, use measuring cups, and sift the media and often the students are told to look for hidden objects. (Admin.Tr. p. 86-87).
Ms. Denney would implement the use of sign language for the Child. (Admin.Tr. p. 110). She would teach him to sign for the snack he chooses. (Admin.Tr. p. 110). *1296 She has been trained in sign language for three years. (Admin.Tr. p. 110). Ms. Denney believes that the Child would fit into her class. (Admin.Tr. p. 118). He would be in the middle of the class, not the highest student, but not the lowest either. (Admin.Tr. p. 118).
Ms. Denney set up an area in the classroom to mirror the classroom at Heartspring for the Child. (Admin.Tr. p. 91, 93). There were objects hung up on the partition by his desk, like a clip, spoon, poker chips, and a toothbrush. (Admin.Tr. p. 91). Ms. Denney set up his area this way so that the Child would feel comfortable. (Admin.Tr. p. 91). Ms. Denney's goal is to have the Child isolated for a short period of time and then move him to where he would be a part of the class. (Admin.Tr. p. 91).
A behavior chart is posted on the wall. (Admin.Tr. p. 82). If a student is behaving, there is a happy face on the chart. (Admin.Tr. p. 82). At the end of the day, the students can cash in their happy faces for candy, snacks or toys from a goody box. (Admin.Tr. p. 82).
The students leave the classroom and go to the cafeteria for lunch. (Admin.Tr. p. 97). They obtain lunch the same way as all the other students. (Admin.Tr. p. 97). The students go to the auditorium for assemblies and certain games. (Admin.Tr. p. 98). The students go the media center to choose books, check them out, and return them. (Admin.Tr. p. 98). They go to the gymnasium or outside for physical education. (Admin.Tr. p. 105). The class also goes on many field trips. (Admin.Tr. p. 106). They go to the pool or the beach a few times a year. (Admin.Tr. p. 106).
Patrick McGreevy, Ph.D. provided a Behavior Analysis Consultation for the School Board at the hearing before the ALJ. (Doc. 50, Exh. 5). Dr. McGreevy observed the Child at Heartspring. (Doc. 50, Exh.5, p. 1). He found the staff to be pleasant and the Child enjoyed interacting with the staff. (Doc. 50, Exh. 5, p. 1). After observing the Child on several occasions, Dr. McGreevy concluded that the Heartspring program was a pleasant and supportive residential and educational program for students with needs similar to the Child. (Doc. 50, Exh. 5, p. 2). He found the program to have certain "exemplary components" such as the "Murdock prompting procedures and the self-graphing data sheets." (Doc. 50, Exh. 5, p. 2). These components assure that the Child will be able to complete daily living skills without vocal prompts. (Doc. 50, Exh. 5, p. 2). Dr. McGreevy found the Heartspring program to be lacking in communication and language components. (Doc. 50, Exh. 5, p. 2). Dr. McGreevy determined that the block system used at Heartspring does not provide expressive communication skills and no acquisition of language. (Doc. 50, Exh. 5, p. 2). He determined that without this expressive communication skills, certain problem behaviors such as ear flicking which may be an attempt to communicate would become even more difficult to manage and may become more frustrating for the child. (Doc. 50, Exh. 5, p. 2). Dr. McGreevy also found a deficiency in the Heartspring's program regarding managing resistance to instruction. (Doc. 50, Exh. 5, p. 3). He asserted that Heartspring does not implement the "state-of-the-art" teaching procedures, and made suggestions of some methods that "would improve the program immeasurably" for the Child. (Doc. 50, Exh. 5, p. 3). Dr. McGreevy determined that the Child's needs were not being met at Heartspring with respect to communication and problem behaviors, and he opined that these needs could be met in a "state-of-the-art" program in the Lee County School District where he has been providing training to the ESE staff. (Doc. 50, Exh. 5, p. 3). Dr. McGreevy suggested that the Child be *1297 placed in this type of program or a similar one that emphasizes expressive communication and language, and "provide a complete analysis of resistance to instruction and `flicking', along with scientifically validated teaching and behavior management procedures." (Doc. 50, Exh. 5, p. 3).
Marsha Vollmar testified at the Due Process hearing. Ms. Vollmar is employed as the program administrator for the Agency for Persons with Disabilities. (Admin.Tr. p. 206). Ms. Vollmar administers services for the disabled in a five county area including Lee County. (Admin.Tr. p. 207-208). If the custodial parent of a child with autism receives a Medicaid Waiver, the custodial parent would receive services for the child, and these services would be funded by the federal and state governments. (Admin.Tr. p. 208). There are many services available for children with autism including respite care, personal care assistance, behavioral analysis, as well as other services. (Admin.Tr. p. 209-10). This Agency can provide residential placement if necessary. (Admin.Tr. p. 216).
Terese Conrad, a speech language therapist for the Child at Heartspring testified at the Due Process Hearing. (Admin.Tr. p. 467, 480, 481). Ms. Conrad testified that when the Child arrived at Heartspring he was nonverbal, wanted to be wrapped in a blanket and was not willing to use his hands other than to hurt himself or occasionally take food. (Admin.Tr. p. 480). At the IEP meeting on May 25, 2004, Ms. Conrad stated that there was a disagreement as to the use of objects to communicate versus the use of sign language. (Admin.Tr. p. 483). Ms. Conrad testified that for nonverbal students, communication is broken down into the lowest level which is concrete objects, then it progresses to pictures, and then to verbal speech. (Admin.Tr. p. 483). Ms. Conrad found that it was appropriate to use symbols for the Child's expressive and receptive language. (Admin.Tr. p. 484). At the IEP meeting, no one from Heartspring proposed that the Child be moved from there. (Admin.Tr. p. 488). The Child was stable at Heartspring when Ms. Conrad left Heartspring in July 2004. (Admin.Tr. p. 494). Ms. Conrad testified that the Child needs consistency to obtain educational benefit. (Admin.Tr. p. 497). Ms. Conrad found that the Child needs multiple repetitions to learn, which would include instruction beyond the normal school day. (Admin.Tr. p. 497). Ms. Conrad provided services during the school day and in the group home. (Admin.Tr. p. 500). The Child showed signs of aggression in the classroom by screaming, pinching or scratching. (Admin.Tr. p. 503). The Child engaged in dropping, elopement, masturbation, stripping, property destruction, and ear hitting. (Admin.Tr. p. 504, 510, 511, 512).

III. Placement of the Child
Although the Parent raises other procedural defects in the IEP dated May 25, 2004 and June 25, 2004, the main issue in this case, as it was in the prior case, is the placement of the Child. The Parent argues that the Child will not receive educational benefit unless he is placed in a residential facility and the School Board asserts that the Child will receive an appropriate education at Diplomat.
The IDEA provides that the education of a student will be provided whenever possible in a regular public school, with the child participating in the regular activities of non-handicapped children as much as possible. M.M. v. School Board of Miami-Dade County, Florida, 437 F.3d at 1096. However, the IDEA also provides "for placement in private schools at public expense where this is not possible". Id. (citing, Loren F. v. Atlanta Independent School System, 349 F.3d 1309, 1312 *1298 (11th Cir.2003)). To meet the FAPE requirements, a child must be educated in the least restrictive environment possible. 20 U.S.C. § 1412(a)(5). "To the maximum extent appropriate," a child must be educated with children who are not disabled, and disabled children must not be separated from "the regular educational environment" unless "the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5). If the School Board is unwilling or unable to provide appropriate special education, then the IDEA provides that the cost of a private school may be reimbursed if the public school did not make FAPE available to the child. Loren F. v. Atlanta Independent School System, 349 F.3d 1309, 1312 (2003), 20 U.S.C. § 1412(a)(10)(C)(ii).
The law has not changed from the prior case, and the Court relies on the same cases as previously cited. "Despite the statutory preference for mainstream placements, the IDEA recognizes that some disabled students need full-time care in order to receive educational benefit." Independent School District No. 284 v. A.C., 258 F.3d 769, 774 (8th Cir.2001). The statute and regulations included full-time care as ah option for students by defining the term "special education" to mean instruction in hospitals and institutions. 20 U.S.C. 1401(24) and 34 CFR 300.26(a)(i). "Thus the IDEA requires that a state pay for a disabled student's residential placement if the student, because of his or her disability, cannot reasonably be anticipated to benefit from instruction without such a placement." Independent School District No. 284 v. A.C., 258 F.3d at 774. A court must determine whether the child is receiving educational benefit to determine the extent of a school board's obligations under the IDEA. Gonzalez v. Puerto Rico Department of Education, 254 F.3d 350, 352 (1st Cir.2001) A school district is not required to support a disabled child in a residential program "`simply to remedy a poor home setting or to make up for some other deficit not covered by the Act. It is not the responsibility of local officials under the Act to finance foster care as such: other resources must be looked to.'" Id. at 353, (citing Abrahamson v. Hershman, 701 F.2d 223, 227-28 (1st Cir.1983)). However, courts have held that the state is responsible for the costs of a residential program when "`medical, social or emotional problems that require hospitalization create or are intertwined with the educational problems.'" Mrs. B. v. Milford Board of Education, 103 F.3d 1114, 1120 (2nd Cir.1997), (citing Vander Malle v. Ambach, 667 F.Supp. 1015, 1039 (S.D.N.Y. 1987)), See, 34 C.F.R. § 300.302. A school board is not required to "maximize" a child's education so that the child can reach his potential, but rather must provide an "appropriate" education and some environments are not suitable for a disabled child to receive an appropriate education. Mrs. B. v. Milford Board of Education, 103 F.3d at 1122. "In deciding if a school must fund a residential placement, the court must determine whether the child requires the residential program to receive educational benefit." Id., (citing Abrahamson v. Hershman, 701 F.2d at 227-228). A court must consider whether a child can receive educational benefit outside of a residential program. Independent School District No. 284 v. A.C., 258 F.3d at 777.
"The fact that a residential placement may be required to alter a child's regressive behavior at home as well as within the classroom, or is required due primarily to emotional problems, does not relieve the state of its obligation to pay for the program under federal law so long as it is necessary to insure that the child can be properly educated." Mrs. B. v. Milford *1299 Board of Education, 103 F.3d at 1122. The IDEA does not require that a child spend years in an educational environment that is not appropriate just to allow a school district to try every option short of residential placement. Seattle School District, No. 1 v. B.S., 82 F.3d 1493, 1500 (9th Cir.1996).
The School Board's position is that the Child should be transferred to Diplomat to attend special education classes at a regular school, and that there are services that the community can provide to the parents to help with the issues of care for the Child before and after school. The Parent contends that the Child will not have the consistency he needs to receive educational benefit if he is not in a residual program that provides this consistency throughout the day and night. These arguments are very similar if not the same as the arguments made in the prior case regarding the Child. Just as in the earlier case, the proper placement of the Child is a very difficult decision. It is undisputed that the Child is making educational progress at Heartspring. It is very clear from the proposed IEP that Heartspring developed for the Child that he is receiving educational benefit from the Heartspring program. The issue is whether the Child can receive some educational benefit from the Diplomat program.
The Court recognizes that IDEA does not require that the Child be placed in the best program to maximize his potential, but rather an educational program that is sufficient for the Child to obtain some educational benefit. The program at Diplomat appears to be a wonderful program for a child with autism. However, even though the program obviously would provide some instruction while the Child is at the school, the real issue is when the Child leaves the school, will all of the instruction be lost because it is not being reinforced with consistency throughout the Child's entire day. The School Board has not provided any evidence or even any information that will assure the Court that once the Child leaves his structured school day at Diplomat that any of the lessons he learned will stay with him while he is away from the school. The School Board did provide testimony that services are available to the Child and the Parent from the community such as respite care, care with bathing, and so on, but there was no testimony that there would be a consistency throughout the day and night that would afford the Child some educational benefit. The Court is impressed by the educational benefit that the Child is receiving at Heartspring. The Child arrived at Heartspring preferring to be wrapped in a blanket and not use his hands. He has progressed far beyond that point and is swimming, walking on a treadmill, and has some very basic communication. However, his maladaptive behaviors such as earflicking continue and some new maladaptive behaviors have formed.
Dr. McGreevy testified that the teaching method at Heartspring was not the most progressive and that the Child was lacking in expressive communication, language, and resistance to instruction. Although his analysis might be helpful to his teachers, the Court is not required to provide the best program for the Child and as stated above, the Child has received educational benefit at Heartspring. Further, a court must not impose its view of a preferable education method on the State. Rowley, 458 U.S. at 206, 102 S.Ct. 3034. Courts lack the specialized knowledge and experience necessary to resolve difficult questions of educational policy. Id. at 208, 102 S.Ct. 3034. A parent does not have the right to compel a school district to provide a specific program or employ a specific methodology to educate a child. Lachman v. Illinois State Board of Education, 852 F.2d 290, 297 (7th Cir.1988) *1300 cert. den., 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988). Therefore, the School Board has the primary responsibility for formulating an educational program for the Child. Rowley, 458 U.S. at 207, 102 S.Ct. 3034. The Court accepts Dr. McGreevy's testimony that some other type of methodology may be better for the Child.
However, the issue for the Court is not whether Heartspring provides the best methodology, but rather whether residential placement is needed for the Child to obtain educational benefit. Dr. McGreevy did not address how the lack of consistency in the Child's entire day from school to home would impact the Child's education. At a residential facility, the Child would receive consistent education throughout the day that would be reinforced when outside of the classroom. For the Child to receive educational benefit, the Court finds that the consistency of a residential facility is needed. There is no evidence that without consistency, the Child can overcome or even decrease his maladaptive behaviors which interfere with his educational progress. The Court recommends that the Child remain in a residential facility, but makes no recommendation as to whether Heartspring is the correct residential facility for the Child. The Court affirms the decision of the ALJ for the continued placement of the Child in a residential facility.

IV. Alleged Procedural Defects in the IEP dated May 25, 2004 and June 25, 2004
The Parent and Child assert that the IEP dated May/June 2004 does not meet the requirements of the statute. The ALJ determined that the only IEP at issue in this matter was the one developed in May and June 2004 by the School Board (not the one developed by Heartspring). (Final Order, p. 17). The IEP team convened on May 25, 2004 and June 25, 2004 to prepare a new IEP for the 2004-2005 school year. (Pet.A-3-1-16). The meeting occurred at Heartspring. (Final Order, p. 17). The placement for the Child in this proposed IEP was Diplomat Middle School, a public school in Lee County, Florida. (Pet.A-3-16). By letter dated November 24, 2004, the Parent requested a due process hearing pursuant to the IDEA and other statutes and also requested a "stay put" at the Heartspring facility. (Pet.G-13-1). The due process request claimed that the School Board failed to provide FAPE in the following manner:
1) failing to provide notices to the Parent
2) failing to produce timely the Child's educational records
3) failing to list objective and measurable present levels of performance in the IEP
4) failing to list objective and measurable goals in the IEP
5) failing to list objective and measurable short-term objectives, milestones, or benchmarks
6) failing to include evaluation criteria
7) failing to include dates of initiation and duration of services
8) failure to include appropriate transitions and services
9) proposing to change the Child's educational placement from residential to a school based setting
10) failing to develop an appropriate transition plan
(Pet.G-13-2-3).
The Parent argues that the IEPs contain a number of procedural violations. An IEP will not be automatically rendered legally defective if it contains procedural flaws. Roland M. v. Concord School Committee, 910 F.2d 983, 994 (1st Cir. 1990) An IEP will be set aside for procedural *1301 violation only if there is a rational basis to believe that the procedural inadequacies have compromised the student's right to an appropriate education, or have seriously hampered the parents' opportunity to participate in the formulation of the IEP or caused a deprivation of educational benefits. Hampton School District v. Dobrowolski, 976 F.2d 48, 54 (1st Cir.1992), citing Roland M. v. Concord School Committee, 910 F.2d 983 (1st Cir. 1990) The parents bear the burden of proving that the procedural flaw harmed the child. Roland M., 910 F.2d at 995.

A. Requirements of an IEP
An IEP must meet the following procedural requirements set forth in 20 U.S.C. § 1414(d)(1)(A):
The term "individualized education program" or "IEP" means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with this section and that includes 
(i) a statement of the child's present levels of educational performance, including 
(I) how the child's disability affects the child's involvement and progress in the general curriculum . . .
(ii) a statement of measurable annual goals, including benchmarks or short-term objectives, related to 
(I) meeting the child's needs that result from the child's disability to enable the child to be involved in and progress in the general curriculum; and
(II) meeting each of the child's other educational needs that result from the child's disability;
(iii) A statement of the special education and related services, and supplementary aids and services to be provided to the child and a statement of the program modifications or supports for school personnel that will be provided for the child 
(I) to advance appropriately toward attaining the annual goals;
(II) to be involved and progress in the general curriculum in accordance with clause (i) and to participate in extracurricular and other nonacademic activities; and
(III) to be educated and participate with other children with disabilities and nondisabled children in the activities described in this paragraph; . . .
(vii) (I) beginning at age 14, and updated annually, a statement of the transition service needs of the child under the applicable components of the child's IEP that focuses on the child's courses of study (such as participation in advanced-placement courses or a vocational education program);
(II) beginning at age 16 (or younger, if determined appropriate by the IEP Team), a statement of needed transition services for the child, including when appropriate, a statement of the interagency responsibilities or any needed linkages; . . .
(viii) a statement of 
(I) how the child's progress toward the annual goals described in clause
(ii) will be measured; and
(II) how the child's parents will be regularly informed (by such means as periodic report cards), at least as often as parents are informed of their nondisabled children's progress, of 
(aa) their child's progress toward the annual goals described in clause (ii); and
(bb) the extent to which that progress is sufficient to enable the child to achieve the goals by the end of the year.
*1302 The Regulations provide further guidance as to the content of the IEP. The IEP must contain "[a] statement of the child's present levels of educational performance, including  (i) How the child's disability affects the child's involvement and progress in the general curriculum (i.e., the same curriculum as for nondisabled children.)" 34 C.F.R. § 300.347(a)(1). The IEP also must include "[a] statement of measurable annual goals, including benchmarks or short-term objectives, related to  (i) Meeting the child's needs that result from the child's disability to enable the child to be involved in and progress in the general curriculum (i.e. the same curriculum as for non-disabled children) . . . (ii) Meeting each of the child's other educational needs that result from the child's disability." 34 C.F.R. § 300.347(a)(2). In addition, the IEP must contain a statement of "[h]ow the child's progress toward the annual goals described in paragraph (a)(2) of this section will be measured" and how the parents of the child will be kept informed of the progress of the child. 34 C.F.R. § 300.347(a)(7). The Regulations also provide that transition services must include "[f]or each child 16 (or younger, if determined appropriate by the IEP team), a statement of needed transition services for the student, including, if appropriate, a statement of the interagency responsibilities or any needed linkages." 34 C.F.R. § 300.347(b).

B. Notice to Parent; and Educational Records
The Parent asserts that she and S.S. (the Child's father) did not receive notice of the IEP meeting and were unable to make travel arrangements to Wichita to participate in the IEP meeting. They were unaware of the draft IEP or the reports considered by the other participants at the IEP meeting on May 25, 2004. In addition, the Parent claims that the School Board did not provide all of the Child's educational records which were requested by the Parent. The Parent must show that she was hampered in her ability to participate in the formation of the IEP.
The Parent testified that she received notice of the IEP meeting in May 2004 when someone at Heartspring called her and asked if she was going to attend. (Admin.Tr. p. 666). She received the call very close to the meeting date. (Admin.Tr. p. 666). She wanted to be physically present at the IEP meeting, but was unable to be present due to lack of timely notification by the School Board. (Admin.Tr. p. 667-668). The Parent appeared by telephone for the May 2004 meeting. (Admin.Tr. p. 669). She had telephone problems during the hearing, and lost communication for about twenty minutes to a half an hour. (Admin.Tr. p. 669). She had not received any reports prior to the meeting. (Admin.Tr. p. 669). The Parent did attend the June 25, 2004 IEP meeting in person. (Admin.Tr. p. 686). The Parent never received access to the Child's educational records prior to the IEP meeting. (Admin.Tr. p. 675). Some of these records were evaluations of the Child. (Admin.Tr. p. 675).
Although from the testimony it shows that the Parent did not receive notice from the School Board and did not receive copies of educational records, it is clear that the Parent participated in both the May and June 2004 IEP meetings. The Parent's concerns were listed in the proposed IEP. (Pet.Exh. A-3-1). The Parent was concerned about consistency in the Child's education and she wanted him to continue making progress. (Pet.Exh. A-3-1). The Court does not condone the actions of the School Board by not providing notice and copies of the records, however, there was no evidence that the Parent or S.S. was hampered in their ability to participate fully in the IEP meeting.

*1303 C. Present Levels, Short-Term Objectives, Annual Goals
The Parent claims the May/June 2004 IEP did not meet the requirements for an IEP because the present levels of performance were not written in objectively measurable terms and were not related to other components of the IEP. The Parent claims that the short-term objectives and annual goals did not meet the requirements of the IEP in that they bore no relationship with the present levels of performance. The present levels of performance were detailed as to the present levels of the Child. As an example, one of the present levels involved tooth brushing and the goal was to have the Child participate in the tooth brushing process and brush certain areas 80% of the time. The short-term objectives then went into great detail as to specific teeth and the brushing motion. The present levels were related to other components of the IEP and have goals within them. The Court finds the present levels of performance to be sufficient. The annual goals and short-term objectives relate to his present levels of performance and set goals for the Child in the future. They are detailed and measurable. The Court finds the Short-Term Objectives and Annual Goals to be sufficient. The Court finds no procedural inadequacies regarding the present levels, short-term objectives and annual goals.

D. Evaluation Criteria
The Parent argues that the Child should have received an Independent Educational Evaluation ("IEE"), citing to 20 U.S.C. § 1415(b)(1) and 34 C.F.R. § 300.502(b)(1). The School Board asserts that the Parent did not request with clarity the independent evaluations that she wanted conducted. In a letter dated October 8, 2004, the Parent through her attorney wrote a letter to Terry Andrews, the Director of E.S.E. Services for the School Board. (Pet.G-8-1). In the letter, counsel states, "[f]urther, my clients do not believe the Lee County School District reached the correct conclusions or administered the proper, unbiased evaluation, or misinterpreted the evaluation administered and therefore request independent evaluations." (Pet.G-8-1). In response, counsel for the School Board sent a letter to counsel for the Parent and Child stating that the School Board needs
further information regarding your request for `independent evaluations.' In a single statement you have stated disagreement with the conclusions reached, as well as the propriety, administration and interpretation of unspecified evaluations, and requested independent evaluations. Please specify the evaluation(s) you wish to have performed independently, so that we can properly and effectively respond to the request.
(Pet.G-11-2). The ALJ found the School Board should have initiated an IEE or requested a due process hearing. (Doc. 1, Final Order, ¶ 105). Upon review of this case, independent evaluations would have been very beneficial, however, from a procedural standpoint, the Parent's request may have been too vague for the School Board to act upon. When the School Board asked for clarification, the Parent ignored the request. The Court determines that the Parent's request for independent evaluations was not clear enough for the School Board to act on the request, and when the School Board asked for clarification, it received no response. The Court finds no procedural flaws with the School Board failing to initiate an IEE from the vague request by the Parent in October 2004.
Later, the School Board attempted to arrange an IEE, but the parties, as they had done many times before, became embroiled in a dispute as to who was the appropriate person to conduct the IEE. *1304 The School Board located Dr. Mitchel Woltersdorf near Heartspring, and made the arrangements to transport the Child to his office. The Parent objected insisting that the evaluation be conducted by someone in Cleveland, Ohio or Fort Myers, Florida. The School Board declined this request. The Court finds that if the parties could have reached some compromise, the Child would have received a needed IEE, however, they could not. The Court again does not condone the School Board's actions, but finds no procedural flaw with the School Board's conduct.

E. Initiation and Duration of Services
The Parent asserts that the IEP must contain specific special education and related services. The Parent argues that the amount of services must be stated clearly in the IEP for both development and implementation of the IEP. The Parent asserts that the level of services for occupational therapy, adapted physical education and speech/language were written in vague terms, and contrary to the Child's needs. The IEP provides for language therapy, occupational therapy and adaptive physical education for the same duration as the Child had at Heartspring. (See, Pet.A-3-16). These services were for instruction in functional academics, daily living skills, communication, and behavior. The Court finds no procedural inadequacies in the initiation or duration of other services.

F. Transition Services and Plan
The Parent asserts that the IEP is lacking in transition services from Heartspring to Diplomat.[9] The Parent does not cite to a regulation that requires transition services be a part of an IEP. It appears that the main arguments made are that the Child should not be transferred to Diplomat from Heartspring. The Court found that a residential facility was appropriate for the Child so many of the arguments have been addressed already. The Court determines that the IEP was not procedurally inadequate regarding transition services.

G. Behavior Plan
The Parent asserts that the IEP is deficient in that it does not have a behavior support plan. The Parent failed to cite a requirement that an IEP contain a behavior support plan. However, a Positive Behavior Support Plan was included in IEP which also includes a reference to the Heartspring Behavior Support Plan. (Pet.A-3-13). The IEP also included a Behavior Goal/Replacement Behavior Plan. (Pet.A-3-14). Both of these documents discuss inappropriate behaviors and provide a plans for handling them. The Court determines that the IEP was not procedurally inadequate in not having a behavior support plan.

H. Impact on FAPE
The Court finds that other than the issue of placement, the May/June 2004 IEP was not procedurally deficient. Therefore, the procedural issues raised have no impact on the Child's right to FAPE.

V. Conclusion and Recommendation
With the exception of the placement issue, the May/June 2004 IEP for the Child was reasonably calculated to provide the *1305 Child an educational benefit which would allow him to progress in school and in life according to his abilities and capacities. The Court finds that the May/June 2004 IEP is reasonably calculated to provide the Child with FAPE. The Court overrules the ALJ regarding procedural deficiencies in the May/June 2004 other than with regard to placement.
The Court finds that the School Board has failed to show that a school-based placement such as Diplomat Middle School would provide educational benefit to the Child. Further, the School Board failed to prove that the May/June 2004 IEP could be fully implemented at Diplomat Middle School. The Court finds that a residential program is an appropriate placement for the Child to allow him to obtain educational benefit. The Court respectfully recommends the following:
1) The District Court find for E.S. individually and on behalf of B.S., a minor on the Complaint;
2) The District Court find for E.S. individually and on behalf of B.S., a minor on Count II of the Counterclaim as to placement in a residential facility; and for the School Board of Lee County, Florida as to the other procedural deficiencies in the May/June 2004 IEP.
3) The Child be placed in a residential program to allow the Child to receive educational benefit.
4) The School Board bear the costs of the residential program.
5) The District Court find for E.S. individually and on behalf of B.S., a minor on Count I of the Counterclaim, and allow E.S. individually and on behalf of B.S. to file a motion for attorneys fees and costs as the prevailing party on the predominant issue, the placement of the Child.
Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.
NOTES
[1] The educational history of B.S. was set forth in detail by the Administrative Law Judge (ALJ) in his Final Order. (Doc. # 1-2, ¶¶ 2-39.)
[2] The Motions (Docs. ## 28, 30), previously deferred by Order (Doc. # 53) on August 22, 2007, are no longer deferred based on the entry of this Opinion and Order.
[1] Pursuant to the IDEA Case Management Order (Doc. 13), the IDEA portion of the case is bifurcated from the alleged due process violations. Only those counts brought under the IDEA will be addressed in this Report and Recommendation.
[2] Section 230.23(4) of the Florida Statutes was enacted, and Rule 6A-6.03311 of the Florida Administrative code was promulgated to carry out the mandates of the IDEA. See, In Interest of J.D., 510 So.2d 623, 627, nn. 2, 3 (Fla. 1st DCA 1987). Florida incorporated the federal guidelines in § 1003.57 Fla. Stat., and Chapter 6A-6, Florida Administrative Code. See, M.H. v. Nassau County School Bd., 918 So.2d 316 (Fla. 1st DCA 2005).
[3] The IDEA was amended in 2004, after the actions occurred in this case and after the request for a due process hearing. The Court will cite to the pre-2004 version of the IDEA, however, the Court notes that nothing in the 2004 amendments appear to materially affect the decision in this case. See, Schaffer v. Weasi, 546 U.S. 49, 126 S.Ct. 528, 532, 163 L.Ed.2d 387 (2005).
[4] The Final Order is attached as an exhibit to the Complaint (Doc. 1).
[5] The case was remanded back to the District Court regarding the issue of attorney's fees.
[6] "Pet." exhibits refer to the Petitioner's exhibits which are part of the records from the DOAH hearing.
[7] "Admin. Tr." refers to the transcript of the Administrative Hearing held at DOAH.
[8] One of the exhibits at the Administrative Hearing is a videotape of Diplomat. (The video tape is labeled "Diplomat Middle School, 04-4300E", and is Resp. Exh. 10, see Admin. Tr. p. 99).
[9] The School Board discusses transition services for the proposed transfer from Heartspring to Diplomat and also, a transition plan for the Child who was nearing his 14th birthday at the time of the June 25, 2004 IEP meeting. The Parent only raises the transition services regarding a transfer from Heartspring to Diplomat, and therefore, the Court will address only this proposed transition.